HERRICK, FEINSTEIN LLP
*Attorneys for W Financial Fund, LP*
Andrew C. Gold
Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com
hhuynh@herrick.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

In re      Chapter 11

20 BAYARD VIEWS, LLC,      Case No. 09-50723 (ESS)

      Debtor.

------------------------------------------------------x

20 BAYARD VIEWS, LLC,

      Plaintiff,      Adv. Pro. No. 10-01112 (ESS)

     v.

W FINANCIAL FUND, LP and BRT
REALTY TRUST,

      Defendants.

------------------------------------------------------x

### OBJECTION OF W FINANCIAL FUND, LP TO DEBTOR'S MOTION FOR A LIMITED INJUNCTION TO ENJOIN CONTINUATION AND/OR PROSECUTION OF A LAWSUIT AGAINST GUARANTOR, OR, ALTERNATIVELY, EXTENDING THE AUTOMATIC STAY TO GUARANTORS TO EFFECTIVELY STAY THE LAWSUIT

W Financial Fund, LP and BRT Realty Trust (collectively, "WFF"), by their counsel Herrick, Feinstein LLP, submit this objection (the "Objection") to the motion (the "Motion") [Docket No. 3] of 20 Bayard Views, LLC (the "Debtor") seeking (i) a limited injunction enjoining the continuation and/or prosecution of an action (the "State Court Action"), including but not limited to the enforcement of a judgment, by WFF pending in New York

Supreme Court, Nassau County (the "State Court") against Moshe Lax, the Estate of Chaim Lax and Yitzchok Hager (collectively, the "Guarantors"), or (ii) in the alternative, extending the automatic stay to apply to the State Court Action, and respectfully represent as follows:

## PRELIMINARY STATEMENT[1]

1.     The Debtor requests that this Court grant the extraordinary and drastic relief of enjoining WFF from enforcing its rights against the Guarantors, either by granting a preliminary injunction under section 105 of the Bankruptcy Code or by extending the automatic stay provisions to the non-debtor Guarantors, based on nothing more than the unsupported assertion that, "upon information and belief," the Guarantors will not be able to provide the "substantial funding" for the Debtor's Plan if WFF is permitted to continue prosecution of the State Court Action.  The Debtor asserts without support that continuation of the State Court Action will doom the confirmation of the Plan and jeopardize the rights and remedies of all creditors in the process.

2.     As a preliminary matter, it should be clarified that the Guarantors are not making "substantial funding" or "funding the Plan."  They are simply paying the Debtor's legal fees.  Under the Plan, the Debtor's Equity Holders[2] are purportedly funding the $1 million Professional Fees Account[3] in order to retain their equity interests, and the Debtors may seek contribution from the Guarantors to fund the account as well.[4]  To the extent that any funds of the Guarantors will be infused into the Debtor's estate for its restructuring, such funds (i) represent, at most, just 2%-5% of all proposed Plan distributions, and (ii) reach only the pockets

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them below.
[2] Moshe Lax, who is a Guarantor, is not an Equity Holder and, therefore, there is absolutely no basis for granting an injunction in favor of Moshe Lax.
[3] The escalation of professional fees in this case to $1 million is in stark contrast to the Debtor's assurances at the commencement of this case (when the Debtor was seeking to use WFF's cash collateral to pay its professionals) that the Debtor would make a swift exit from bankruptcy and rein in its professional fees.
[4] It is beyond belief that a non-equity holder guarantor would contribute to the Debtor's legal fees.

of the Debtor's professionals—not one penny of the Guarantors' funding (assuming the Plan is confirmed in the first place) will be used to pay the claim of any creditor. And in exchange for the payment of these legal fees, the Guarantors seek the benefit of an injunction against prosecution of the State Court Action (in which the State Court has already ruled on the Guarantors' liability for the principal amount of $8.7 million under the Guaranty) and enforcement of the State Court Judgment.

3.     In seeking the injunction, the Debtor points to the illusory harms that will be visited upon it if the State Court Action is not immediately enjoined, because the Guarantors will be unable to both pay the Debtor's professional fees and the State Court Judgment. First, the Debtor has provided no evidence that the Guarantors do not have the resources to satisfy both obligations. On the contrary, the financial statements the Guarantors provided to WFF at the time of the loan transaction show that the Guarantors have a combined net worth of over $240 million. Second, the Debtor tellingly does not even attempt to assert that continuation of the State Court Action will divert the necessary attention of the Guarantors from the Debtor's reorganization efforts, a touchstone for finding irreparable harm in section 105 injunction cases. This is because the Guarantors (one of which is an estate) are not at all involved in the day to day management of the Debtor's affairs or the details of the Debtor's reorganization. Finally, the Debtor ignores the fact that, pursuant to the Debtor's own Plan, the three Equity Holders *must* fund the Professional Fees Account in order to retain their interests in the reorganized Debtor, regardless of whether or not the State Court Action proceeds.

4.     The true harm in this case will be to WFF if the Court were to grant the injunction. As set forth below, the recent conduct of some or all of the Guarantors in transferring assets to non-guarantor entities to remove the assets from the reach of the Guarantors' creditors,

including WFF, is troubling to say the least.  An injunction would only enable the Guarantors to continue their inequitable conduct in stripping their businesses of assets that could be used to satisfy WFF's judgment.  Moreover, one of the Guarantors is an estate, and delaying or enjoining the State Court Action puts WFF at serious risk of being precluded from enforcing its claim against the estate once it has been administered.

5.      Ultimately, if the Court were to entertain the Debtor's request, it would render the Guaranty meaningless, and set a dangerous precedent that would permit guarantors of corporate debt to escape liability simply by paying the legal fees in the underlying debtor's bankruptcy case.

## BACKGROUND

### The WFF Loan and the Guaranty

6.      The Debtor owns 37 unsold condominiums and associated storage units and parking spaces in a 62-unit residential building located at 20 Bayard Street, Brooklyn, New York (the "Units"), known as the Bayard Condominium Complex.  The development of the Bayard Condominium Complex was financed by a loan from iStar Loans, LLC ("iStar").  When the initial sales of units dried up, forcing the Debtor to rent the unsold units, iStar required the Debtor to refinance its loan (or otherwise be in default) because iStar would not agree to lend where its collateral consisted of rented condominium units.

7.      In October 2008, WFF and the Debtor entered into that certain Agreement of Consolidation, Extension and Modification of Mortgage (the "Mortgage"), whereby WFF replaced iStar as the Debtor's lender.  In connection with the Mortgage, the Debtor, as maker, entered into that certain Consolidated, Amended and Restated Note in the principal amount of

$17,400,000 (the "Note," and together with the Mortgage and related documents, the "Loan Documents").

8.      In further consideration for the WFF loan, WFF required the Guarantors to guaranty payment and performance of a portion of the Debtor's obligations under the Loan Documents pursuant to that certain Guaranty dated as of October 14, 2008 (the "Guaranty"). A copy of the Guaranty is annexed as Exhibit A to the Affidavit of David Heiden in Support of Objection (the "Heiden Affidavit"). The Guaranty is limited to payment of $8,700,000 of the principal amount of the loan, plus interest, fees and costs. The Guaranty is governed by the laws of the State of New York. *See* Heiden Aff. ¶ 2.

9.      As part of its underwriting requirements, WFF requested and the Guarantors provided financial statements compiled by an accountant evidencing the Guarantors' creditworthiness. Chaim Lax delivered to WFF a statement of net worth that shows his net worth at $205,530,524,[5] as of March 31, 2008. The statement of net worth of Moshe Lax shows his net worth at $22,600,695, as of August 31, 2008. Isaac Hager had a net worth of $15,273,196, as of May 15, 2008. At the time that the parties entered into the Guaranty, the Guarantors had a combined total net worth of <u>over $240 million</u>. Accordingly, the Guaranty was a major component of WFF's collateral security for the loan. *See* Heiden Aff. ¶ 3. Copies of the Guarantors' financial statements are annexed as Exhibit B to the Heiden Affidavit.

10.      WFF agreed to make the $17.4 million loan to the Debtor, in part, on the strength of the Guarantors' credit. *See* Heiden Aff. ¶ 4.

---

[5] Of this amount, $7,581,149 was cash.

**The State Court Action & Subsequent Transfers Of Assets**

11.     On January 22, 2010, following the maturity of the Note, WFF commenced the State Court Action against the Guarantors by filing a motion for summary judgment in lieu of complaint pursuant to New York CPLR § 3213. *See* Heiden Aff. ¶ 5. On May 28, 2010, the State Court granted WFF a judgment awarding it the principal amount of $8.7 million against the Guarantors, jointly and severally (the "State Court Judgment"). *Id.* A copy of the State Court Judgment is annexed as Exhibit C to the Heiden Affidavit.

12.     One of the primary assets of Guarantor Chaim Lax was ownership of Dynamic Diamond Corporation ("Dynamic"). Dynamic was a premier dealer of both diamond jewelry and loose stones. Moshe Lax, Chaim's son, is the co-executor of Chaim Lax's estate and has engaged in a stripping of the assets from Chaim's estate while the State Court Action was proceeding. First, on February 26, 2010, in preparing the stripping of assets, Moshe changed the name of Dynamic to White Coat, Inc. Then, Moshe caused White Coat, Inc. to execute a Deed of Assignment commencing an assignment for the benefit of creditors (the "Assignment"). A copy of the Deed of Assignment is attached as Exhibit E to the Heiden Affidavit. Not surprisingly, Martin Ehrenfeld, the Debtor's chief restructuring officer in this case and Moshe Lax's brother-in-law, was appointed chief restructuring officer of Dynamic.

13.     In connection with Dynamic's Assignment, substantially all of the assets of Dynamic were sold to Diamond Dynamics, LLC ("DD"), a company created in October 2009 that is managed by Moshe Lax (also one of the Guarantors) and 100% owned by Shiandy Lax, the wife of Moshe Lax. A copy of Mr. Ehrenfeld's affidavit in support of the sale of the assets of White Coat, Inc. to DD is annexed as Exhibit F to the Heiden Affidavit. The sales price was

$6,942,926, consisting of payment of $3,826,258 to Dynamic's lender, Antwerp Diamond Bank, and the assumption of $3,116,668 of liabilities *(most of which is a $2 million unsecured loan payable to Moshe Lax)*. *See* Heiden Aff. Exh. F ¶ 16.

14. To support this sale, Moshe and Ehrenfeld commissioned an appraisal of the market value of Dynamic's inventory, consignment goods and other assets and an appraisal of the market value of a $5.6 million receivable from Madison Avenue Diamonds, LLC ("MAD"). The MAD receivable was appraised at $0, which is not surprising since MAD is owned by Chaim Lax. *See* Heiden Aff. Exh. F ¶ 13. Also noteworthy is that the equity value of Dynamic was $20,361,046, according to Dynamic's financial statements for the year ending December 2007 provided to WFF. The precipitous decline in the appraised value of Dynamic, the timing of the sale of Dynamic after the summary judgment motion was filed in the State Court Action, all the machinations involved in the Assignment in order to transfer the assets of Dynamic to DD, and questions regarding DD's access to over $3 million in cash to purchase Dynamic, all raise suspicions regarding the propriety of the transaction.[6]

15. The result of the sale of Dynamic's assets to DD was to remove valuable assets of a business owned by Chaim Lax, a Guarantor, and transfer them to a non-Guarantor entity owned by Moshe Lax's wife. These assets would otherwise be available to pay WFF's $8.7 million judgment.

16. Furthermore, to add insult to injury, upon information and belief, DD continues in the same business as Dynamic, operating out of the same building, with the same employees and selling to the same customers, including Tiffany & Co.

---

[6] WFF has served discovery requests on the Debtor in order to obtain information on these issues and has not received any responses to date.

**The Debtor's Bankruptcy Case and Chapter 11 Plan**

17.     On December 4, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate and manage its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed.

18.     The Debtor's equity holders are Jack Weingarten, LX Holdings, LLC (as holder of the Chaim Lax Interest), and Yitzchok Hager (collectively, the "Equity Holders"). Accordingly, Moshe Lax is a Guarantor but not an Equity Holder and Jack Weingarten is an Equity Holder but not a Guarantor.

19.     On May 25, 2010, the Debtor filed its Third Amended Plan of Reorganization of 20 Bayard Views, LLC Under Chapter 11 of the Bankruptcy Code (the "Plan") [Docket No. 95]. The Plan contains the following provisions that are relevant to the Guarantors and/or the funding of the account to pay the Debtor's professional fees (the "Professional Fees Account"):

i.      "A Holder of Allowed Equity Securities of the Debtor shall retain his Equity Securities and receive an equal Equity Security Share in the Reorganized Debtor so long as such Holder complies with the capital call to fund the Administrative Claims/Priority Account and Professional Fees Account. Any Holder not complying shall have its Equity Securities' share discharged and cancelled." Plan, Art. III(a)(7)(b).

ii.     "Consistent with the Plan, the Debtor may elect to effectuate the following restructuring transactions: 1. Make a capital call of the Owners to fund the Administrative Claims/Priority Claims Account and Professional Fees Account; 2. Seek contribution from the Guarantors to fund the Administrative Claims/Priority Claims Account and Professional Fees Account . . . ." Plan, Art. VI(E).

iii. *"Except as otherwise provided in this Plan or the Confirmation Order, all Entities that have held, currently hold or may hold Claims or other debts or liabilities against the Debtor or other right of an Equity Security Holder in any or all of the Debtor that are discharged pursuant to the terms of this Plan are permanently enjoined, on and after the Effective Date, from taking any of the following actions on account of any such Claims, debts, liabilities or rights: (i) commencing or continuing in any manner any action (including the Guarantor Action) or other proceeding of any kind with respect to any such Claim, debt, liability, or right other than to enforce any right to a Distribution pursuant to this Plan . . . ."* Plan, Art. X(C) (the "Plan Injunction").

20.     The Debtor states in the Injunction Motion that it has requested funding in the amount of $1 million for the Administrative Claims/Priority Claims Account and the Professional Fees Account from the Guarantors as well as the Equity Holders. Because the Debtor has estimated the Administrative and Priority Claims (as those terms are used in the Plan) to be $65,000, the majority of the funding request is on account of professional fees, the substantial bulk of which are the Debtor's legal fees.

21.     On May 24, 2010, the Debtor commenced the above-captioned adversary proceeding, and on May 25, 2010, the Debtor filed the Injunction Motion. The Debtor seeks to enjoin WFF's continued prosecution of the State Court Action principally on the ground that the Guarantors will be unable to fund the Professional Fees Account if WFF is permitted to enforce the State Court Judgment against the Guarantors.

## **OBJECTION**

22.     The Motion should be denied because the Debtor has failed to satisfy its burden to demonstrate that it is entitled to the extraordinary relief of a preliminary injunction to bar WFF from taking action against non-debtors. Nor has the Debtor demonstrated that this case involves the type of "unusual situation" that would warrant the extension of the automatic stay provisions of the Bankruptcy Code to protect third party guarantors of the Debtor.

## I.  The Debtor Is Not Entitled To An
## Injunction Under Section 105(a) of The Bankruptcy Code

23.   While section 105(a) of the Bankruptcy Code may be construed as granting a bankruptcy court discretionary power to enjoin certain actions against non-debtors, "it is an extraordinary exercise of discretion to use that power to stay a third party action not involving the debtor." *In re Bretano's Inc.*, 36 B.R. 90, 92 (S.D.N.Y. 1984) (reversing bankruptcy court's order enjoining action against non-debtor guarantor of a debtor's lease obligations).  Section 105(a) "is not to be employed as a loose cannon." *Sinkow v. Latimer (In re Latimer)*, 82 B.R. 354, 364 (E.D. Pa. 1988).

### A.   Standard for Preliminary Injunction Under Section 105(a)

24.   The standard for granting a preliminary injunction under section 105 of the Bankruptcy Code is set forth in *In re Calpine Corp.*, which states as follows:

> A request by a debtor for an injunction under section 105(a) pending confirmation of the debtor's plans for reorganization is regarded as a request for a preliminary injunction. Although the Second Circuit has declined to enunciate an explicit test for when an injunction should issue, courts have applied the traditional preliminary injunction standard as modified to fit the bankruptcy context. Thus, in the bankruptcy context, the court should evaluate the following factors:  (1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction.

365 B.R. 401, 409 (S.D.N.Y. 2007) (internal quotations and citations omitted) (quoting *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, 2006 WL 3755175, *4 (S.D.N.Y. Dec. 20, 2006)).

B.    The Debtor Does Not Have a Reasonable Likelihood
of a Successful Reorganization Under the Plan as Drafted

25.    The Debtor asserts that there is a reasonable likelihood of a successful reorganization on the basis that the Court has approved the Debtor's disclosure statement with respect to the Plan, and that the hearing on the confirmation of the Plan is scheduled for June 29, 2010. The Plan, however, will be the subject of a contested confirmation hearing because WFF will be filing an objection to confirmation of the Plan. The Plan has a host of infirmities, including that the Plan Injunction is prohibited by statute and case law.[7]

26.    Section 524(e) of the Bankruptcy Code explicitly states that, with few exceptions, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Most courts that reject permanent injunctions protecting non-debtor third parties do so on the basis that section 524(e) precludes such relief. *See Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985) ("The bankruptcy court has no power to discharge the liabilities of a non-debtor pursuant to the consent of creditors as part of a reorganization plan. The broad language of section 524(e), limiting the scope of discharge so that it does not 'affect the liability of any other entity,' encompasses this result.").

27.    Some courts, however, do allow injunctions that protect non-debtor third parties under limited circumstances. These courts argue that although section 524(e) prevents the discharge from releasing non-debtor third parties, the court may, on rare occasions for exceptional cases, use its broad equitable powers under section 105 to grant injunctions against non-debtor third parties. These courts have granted such injunctions under a variety of theories,

---

[7] The Debtor makes much of the fact that it is not seeking a release of the Guarantors under the Plan. The Plan Injunction, however, is a permanent injunction against WFF from pursuing its claim on the separate obligation owed on the Guaranty. The effect of the Plan Injunction is the same as an impermissible non-debtor release.

but always, either implicitly or explicitly, invoke the bankruptcy court's section 105 injunctive powers only when they have found authorization for such an injunction elsewhere in the Bankruptcy Code or under other state or federal law. *See In re Chauteaugay Corp.*, 167 B.R. 776 (S.D.N.Y. 1994) (holding that section 105(a) does not give a bankruptcy court unfettered discretion to discharge a non-debtor from liability). The language of section 105(a) limits the bankruptcy court's discretion to acts necessary or appropriate to carry out the purposes of the Bankruptcy Code, which was intended to provide protection to debtors, not non-debtors.

28.     Notwithstanding that courts have granted non-debtor releases, the Second Circuit views "third party plan releases more skeptically." *In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. Apr. 28, 2010) (referring to *Metromedia* and discussing with approval). The Second Circuit Court of Appeals made clear in *In re Metromedia Fiber Network, Inc.*, that the limited exceptions in which a non-consensual third party injunction could be granted were reserved for "rare cases." 416 F.3d 136, 141 (2d Cir. 2005) ("While none of our cases explains when a nondebtor release is 'important' to a debtor's plan, it is clear that such a release is proper only in rare cases."). The *Metromedia* court provided the following guidance on issuing third party releases and injunctions:

> Courts have approved nondebtor releases when: the estate received substantial consideration; the enjoined claims were "channeled" to a settlement fund rather than extinguished; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; and the plan otherwise provided for the full payment of the enjoined claims. Nondebtor releases also may be tolerated if the affected creditors consent. . . . But this is not a matter of factors and prongs. *No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique.* . . . A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan.

416 F.3d at 142-43 (quotations and citations omitted) (emphasis added).

29.     As *Metromedia* teaches, the circumstances here must be "rare," "unique," or "unusual" in order to justify the Plan Injunction for the benefit of the non-debtor Guarantors. But such is not the case here. This is a simple single asset real estate case, in which the principals of the Debtor gave personal guaranties for the payment of the Debtor's obligations under the Loan Documents. It is a scenario played out in nearly every single asset real estate bankruptcy case. To provide the Guarantors a permanent injunction against the prosecution of the Guarantors, especially when one of the Guarantors is an estate, on a liability that has already attached would require the Court in this case to ignore the Second Circuit's binding mandate that third party releases and injunctions be reserved for unusual circumstances.

30.     In addition, this case does not present any of the instances in which the *Metromedia* court deemed susceptible to the granting of a third party release. For example, the Debtor's estate here will not be receiving a "substantial" contribution; there is no separate fund to which WFF's enjoined claim against the Guarantors may be satisfied; and the Debtor has no indemnity or contribution obligations with respect to the Guarantors as a result of the State Court Action. The $1 million payment to the Professional Fees Account represents approximately 2%-5% of the $19.2 million in total plan disbursements that the Debtor proposes to make through the Debtor's operations and the sale of Units, and those funds are not available for distribution to *any* creditor, nevermind the enjoined claims of WFF. Nor is the Plan Injunction itself important to the Plan. The Plan Injunction has no effect on the Debtor, the property of the Debtor's estate or the Debtor's reorganization. While the Debtor may argue that the Plan Injunction is important because it is the carrot that will induce the payment of the Debtor's professional fees, the Debtor may equally rely on the cancellation of equity interests if Equity Holders do not fund the Professional Fees Account as the stick that will bring about the same result.

31.     Lastly, the Debtor argues without citation to any legal support that the Plan Injunction is permissible because the treatment of WFF's claim in full under the Plan relieves the Guarantors from their liability on the Guaranty and the State Court Judgment.  On the contrary, the law is well-settled that the treatment of the underlying claim by the principal obligor of the debt in a bankruptcy proceeding does not relieve the guarantor from liability on account of the guarantee of that debt.  *See* 11 U.S.C. § 524(e) (providing that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"); *see also NCNB Texas Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994) (permitting bank to pursue suit against guarantor where debtor on underlying debt confirmed bankruptcy plan which treated the underlying debt, and reasoning that "discharge of a debtor in reorganization proceedings does not affect a guarantor's liability"); *United States v. Stribling Flying Serv., Inc.*, 734 F.2d 221, 222-23 (5th Cir. 1984) (holding that unconditional guarantors of corporate debtor's debt not affected by confirmation of plan that restructured and reduced the debt, and rejecting argument that confirmation of plan cured default on the accelerated debt); *Union Trust Co. of Rochester v. Willsea*, 275 N.Y. 164, 166 (1937) (holding that creditor's acceptance of stock in payment of debt pursuant to bankruptcy plan did not bar creditor from pursuing guarantor of the debt); *Chem. Bank New York Trust Co. v. Liebman*, 379 N.Y.S.2d 69 (N.Y. App. Div. 1976) (holding that creditor's receipt of portion of debt in bankruptcy proceeding of principal obligor did not discharge liability of guarantor of obligor's indebtedness); *Comi v. DSC Fin. Corp.*, 994 F. Supp. 121, 124 (N.D.N.Y. 1998) ("[W]here a guaranty specifically authorizes the release of an obligor without impairing the ability to seek payment from the guarantor, the guarantor's liability exists independently of the underlying obligation."); *Hampton v. Bank of Lafayette*, 578 S.E.2d 486, (Ga. Ct. App. 2003) (disagreeing

with guarantor's argument that "because the primary debtor's confirmed bankruptcy plan would have enabled the bank to obtain full payment of cosigned debts . . ., the bank is barred from bringing suit to collect the indebtedness from the debtor's cosignor," on the basis that the debtor's bankruptcy plan did not discharge the guarantor's liability on the guaranty); *Mercantile Club, Inc. v. Scherr*, 651 A.2d 456, 462 (Md. Ct. Spec. App. 1995) ("Because bankruptcy only avoids the debts of the debtor, we must next consider what obligations a guarantor or surety has after the debtor's plan of reorganization in bankruptcy is confirmed. We conclude that the guaranty or surety cannot be eliminated, because extinguishing or modifying the collateral obligation upon the reorganization of the principal debtor would defeat the very purpose of the guaranty--i.e., protection against the principal's inability to pay.") (quotations and citation omitted); *Pemstein v. Stimpson*, 630 N.E.2d 608, 615 (Mass. App. Ct. 1994) ("Guarantors are still liable on the entire original primary debt, notwithstanding the debtor's chapter 11 petition and notwithstanding confirmation of a plan that reduced the corporate debtors' debt to the creditor.").

C.     The Debtor Has Not Demonstrated
       <u>Irreparable Harm in the Absence of an Injunction</u>

32.     The Debtor states in conclusory fashion that WFF's continued prosecution of the State Court Action will impair the Guarantors' ability to fund the Plan and threaten the Debtor's ability to confirm the Plan, which constitutes irreparable harm. Without more, the Debtor has failed to satisfy its burden of demonstrating that the Debtor will suffer irreparable harm unless the Court grants an injunction. In determining whether to issue an injunction pursuant to section 105(a) of the Bankruptcy Code, some courts consider the effect the state court proceeding will have on the debtor's ability to fund a plan of reorganization. *In re Laham*

*Mfg. Co.*, 33 B.R. 681, 683 (Bankr. D.S.D. 1983) (debtor's president to use personal real estate as collateral to finance debtor's reorganization); *In re Otero Mills, Inc.*, 21 B.R. 777, 779 (Bankr. D. N. Mex. 1982) (sale by debtor's president of personal real estate would raise more than foreclosure sale by bank).

33.     Here, contrary to the Debtor's assertion, there simply is nothing in the record to show that the State Court Action would materially reduce the Guarantor's asserted ability to fund a plan of reorganization.  Under such circumstances, courts will refuse to grant an injunction against non-debtor parties, even where the non-debtor party intends to provide funding to the debtor.  *See, e.g., In re Veeco Investment Co.*, 157 B.R. 452, 456 (Bankr. E.D. Mo. 1993) (refusing to enjoin creditor from enforcing judgment against guarantors even where guarantors' financial contribution was necessary to fund debtor's reorganization plan); *In re Costa & Head Land Co.*, 68 B.R. 296, 301 (N.D. Ala. 1986) (denying preliminary injunction against executing on pledged securities where debtor failed to provide evidence that pledged securities would be available to assist the debtor's reorganization).

34.     In *In re Third Eighty-Ninth Associates*, 138 B.R. 144 (S.D.N.Y. 1992), the District Court for the Southern District of New York reversed and remanded in part the bankruptcy court's grant of an injunction staying a creditor from proceeding against non-debtor guarantors until a reorganization plan could be consummated.  The debtor in *Third Eighty-Ninth Associates* sought the injunction on the grounds that the guarantors were key personnel in the debtor's reorganization efforts and that the guarantors' commitment to funding a plan of reorganization would be impaired by the continuation of the state court actions against the guarantors.  The bankruptcy court granted the injunction on those grounds, but on appeal, the district court held that the record did not contain sufficient evidence to prove that two of the

three guarantors were so involved in the operations of the debtor's business that the diversion of their attention from the task of reorganizing the debtor would burden the estate. In addition, the court held that

> The record also does not support the finding that the Guaranty Actions would burden the estate by impairing an infusion of capital. The Guarantors have proposed, and purportedly remain willing, collectively to inject $1.4 million into reorganization. Nevertheless, except for Thomas's testimony that defending the Guaranty Action would impair *his* ability to make capital contributions, the record contains no evidence that a joint judgment against the Guarantors would affect their collective ability to make such an infusion. Perhaps more importantly, the Guarantors have until now conditioned this infusion of capital on Chase's release of the Guaranty and some of its security interests in the Monarch, a proposal decisively rejected by Chase. The conditional nature of the infusion casts serious doubt on whether any funds actually are available to the Debtor for use in the reorganization."

*In re Third Eighty-Ninth Assocs.*, 138 B.R. at 149 (internal citations omitted).

35.     Similar to the guarantors in *Third Eighty-Ninth Associates.*, the Debtors here are vague about the Guarantors' ability and commitment to fund the Professional Fees Account. The Guarantors' financial statements contradict the Debtor's claim that the Guarantors will not be able to provide funds to the Debtor and satisfy their obligations under the Guaranty. Moreover, as in *Third Eighty-Ninth Associates*, to the extent that the Debtor is arguing that the Guarantors will refuse to make funding to the Plan absent the Plan Injunction, the Debtor will not be able to demonstrate irreparable harm because the impermissible Plan Injunction means that the Debtor really never would have had access to the Guarantor funds in the first place.

36.     It also bears noting that the Guarantors' intention to contribute funds towards the Debtor's rehabilitation as conditioned upon the Plan Injunction, reveals that the Guarantors' promise to inject funds into the Debtor's estate is not a contribution to the reorganization at all, but rather an attempt to take money that would otherwise be available to

WFF to satisfy its judgment and pay *that* money to fund the Debtor's legal fees. *See, e.g., In re Costa & Head Land Co.*, 68 B.R. at 302-03 (in balancing potential harm, non-debtor guarantors not entitled to injunction against bank creditor where injunction would cause bank "an actual loss of monies it is clearly entitled to receive").

37.     On the other hand, in those cases involving the impairment of a non-debtor's ability to fund a plan in which the court grants an injunction, the court makes specific findings that the party for whom the injunction benefits is key to the management of the debtor or that the contribution was substantial, which is not the case here. *See, e.g., In re Lazarus Burman Assocs., L.B.*, 161 B.R. 891, 899 (Bankr. E.D.N.Y. 1993) (specific finding that "Principals are the sole participants in the Debtor's rehabilitation" and "[w]ithout a stay against pending proceedings, the Principals will be unable to devote their full time and energy toward implementing the Debtor's reorganization, and the Debtor's reorganization will suffer"); *In re Otero Mills, Inc.*, 21 B.R. 777, 779 (Bankr. D. Mex. 1982) (granting injunction of foreclosure action against property that debtor's president intended to sell in order to pay corporate debts of the debtor, and creditor did not put on evidence to dispute debtor's claim of irreparable harm); *In re Steven P. Nelson, D.C., P.A.*, 140 B.R. 814,  (Bankr. M.D. Fla. 1992) (enjoining state court suits against guarantors to enforce guaranties, and specifically finding that diversion of guarantor/president/sole shareholder/sole executive from debtor's reorganization constitutes irreparable harm); *In re Monroe Well Serv., Inc.*, 67 B.R. 746,  (Bankr. E.D. Pa. 1986) (granting injunction against enforcement of lien creditor's rights against purchasers of debtor's oil on a showing of irreparable harm from failure to grant injunction because purchasers' failure to pay would cause the debtors' operations to cease).  Here, the day to day operations of the Debtor are

managed by a non-guarantor third party restructuring office and a non-guarantor related property management company.

D.   The Balance of Harms Tips in Favor of WFF

38.   Enjoining WFF's ability to obtain payment through judicial enforcement of its rights under the Guaranty would be extremely harmful and prejudicial to WFF. First, because one of the Guarantors—Chaim Lax—is an estate, WFF would suffer irreparable harm by any delay in its ability to enforce the State Court Judgment and assert a claim against the estate before the estate is administered and WFF's guaranty claim against Chaim Lax is extinguished. Second, enjoining the State Court Action would be tantamount to requiring WFF give up its significant additional collateral (in the form of the Guaranty) simply to provide the Debtor an opportunity to make payments to various other creditors who not only are junior to the WFF, but also do not have the benefit of personal guarantees from the Guarantors. WFF made the $17.4 million loan to the Debtor based in part on the creditworthiness of the individual Guarantors. It would be inequitable for WFF to be now barred from enforcing its rights to be paid by non-debtor individuals whose credit it relied upon, and bargained to obtain, in extending the loan to the Debtor. As the court in *In re Bretano's Inc.*, acknowledged, "[t]his circumstance does not . . . justify depriving [the creditor] of its contractually bargained for right to seek judicial redress directly against the guarantor." 36 B.R. 90, 91 (S.D.N.Y. 1984).

39.   Lastly, it is clear that an injunction against the prosecution of the State Court Action would only serve to permit the continued inequitable conduct of the Guarantors, such as the transfer of assets out of the reach of their creditors. In *In re Myerson & Kuhn*, 121 B.R. 145, 158 (Bankr. S.D.N.Y. 1990), the court refused to issue a preliminary injunction for the

benefit of a particular non-debtor partner, because "[his] conduct to date has not been equitable, and he is not entitled to equitable relief." In that case, Bowie Kuhn, a non-debtor partner of the insolvent law firm, engaged in activity similar to that of the Guarantors in connection with the Assignment of Dynamic discussed above: "Knowing of the pendency of litigation against him, Kuhn sold his house in New Jersey for $1.2 million, removed assets from New York, became unlocatable for the service of process, and purchased a new home in Florida and apparently an annuity, with the intent to defeat creditors. The transfers may be fraudulent transfers." *Id.* On those facts, the court determined that Kuhn was not entitled to the equitable relief of an injunction under section 105(a). This Court likewise should not countenance the extension of equitable relief to parties that have not conducted themselves in an equitable manner.

40.     Conversely, the continuation of the State Court Action has no effect on the Debtor. The claims in the State Court Action do not involve the Debtor or property of the Debtor's estate. In fact, the continuation of the State Court Action does not really harm the Guarantors either, because "[i]f the guarantors pay the [creditor], they may be subrogated to the [creditor's] position. The guarantors have not convinced this Court that the balance of hardships tips decidedly toward the party seeking the injunction." *In re Larmar Estates, Inc.*, 5 B.R. 328, 331 (Bankr. E.D.N.Y. 1980). As stated above, the balance of hardships in fact tips in favor of WFF.

41.     The perceived harm to the Debtor, *i.e.*, the possibility that the Guarantors will not fund the Professional Fees Claims, as described above, is unsubstantiated. The Guarantors appear to have the financial wherewithal to fund the Professional Fees Account as well as pay on the obligation under the Guaranty. In addition, the Guarantors will be subrogated to WFF's position if any payment is made to WFF on account of the Guaranty, and the

Guarantors can receive whatever treatment the Debtor's have proposed for WFF's claim under the Plan. In any event, the Equity Holders/Guarantors have a strong incentive to fund the Professional Fees Account, because the failure to do so will result in the cancellation of their equity interests in the Reorganized Debtor.

E.    The Public Interest Weighs in Favor of Denial of an Injunction

42.    In this case, the public interest in enforcing the expectations of contract parties, such as WFF and the Guarantors under the Guaranty, weighs in favor of a denial of an injunction. Protecting a lender's ability to enforce a guaranty serves an important public interest because guaranties are cost effective devices in commercial transactions to help ensure payment of the primary obligor's obligations to the lender. For example, WFF enters into guaranties for the purpose of, among other things, protecting WFF from the insolvency of the primary obligor. Enjoining WFF's ability to pursue payment under a guaranty if a primary obligor were to file for bankruptcy would defeat the purpose of the guaranty. *See* Heiden Aff. ¶¶ 8, 9.

43.    Indeed, in the case of *In re Veeco Investments Co.*, the court determined that granting an injunction for the benefit of non-debtor guarantors did not further any cognizable bankruptcy public interest considerations. 157 B.R. 452, 456 (Bankr. E.D. Mo. 1993) ("After considering [the section 105 injunction] factors, the Court concludes that it may only grant the injunction requested if it extends the existing doctrines under either § 362(a)(3) or § 105 beyond their present application to partnership and corporate principal cases. There is a valid distinction in bankruptcy between the existence of a partnership, its partners and independent guarantors of the partnership's obligations. The Court declines Debtor's invitation to distort this distinction by

treating the guarantors in this case as partners merely by virtue of (1) the necessity of their financial contribution, and (2) their indirect connection to the Debtor through the Trusts.").

## II.    The Automatic Stay Under Section 362 Of The Bankruptcy Code Should Not Be Extended To The State Court Action

44.     By its plain language, section 362(a)(1) of the Bankruptcy Code stays actions only against a debtor.   Courts continually have held that the automatic stay is inapplicable to actions and proceedings against non-debtors. *See Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986); *In re United Health Care Org.*, 210 B.R. 228, 232 (S.D.N.Y. 1997); Ripely v. Mulroy, 80 B.R. 17, 19 (E.D.N.Y. 1987); *In re Phar-Mor Securities Litigation*, 166 B.R. 57, 62 (W.D.Pa. 1994) ("[T]the Code was not intended to stay action . . . where the non-debtor's liability rests upon his own breach of duty.").   The automatic stay of section 362(a) is not extended to "entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the Chapter 11 debtor." *CAE Indus. v. Aerospace Holdings Co.*, 116 B.R. 31, 32 (S.D.N.Y. 1990).   When the stay does not apply automatically, the debtor bears the burden of demonstrating that the circumstances warrant extending the stay to protect non-debtors. *In re Third Eighty-Ninth Assocs.*, 138 B.R. at 146.

45.     The protections of the automatic stay should be extended to non-debtors only under "unusual situations," which "do[ ] not, however, apply to a non-debtor surety, who is being sued on its surety contract and has obligations that are independent and primary, not derivative of those of the debtor." *In re Veeco Investments Co.*, 157 B.R. at 454, (quotations and citation omitted).   "When a guarantor or surety, however, is sued for the debts of its principal, payment is made from the assets of the guarantor and not from the debtor's assets.   Thus, the net pool available to creditors is not depleted.   Accordingly, a non-debtor surety, who is being sued

on its surety contract is not protected by the automatic stay." *Id.* at 454-55 (quotations and citations omitted).

46.     "Specifically, courts in this circuit and others have held that while the automatic stay ordinarily applies only to actions against the debtor itself, it is properly extended to actions against non-debtors where an identity of interest exists between the debtor and non-debtor defendant such that the debtor is the real party defendant and the litigation will directly affect the debtor and, more particularly, the debtor's assets or its ability to pursue a successful plan of reorganization under Chapter 11." *In re Continental Airlines, Inc.*, 177 B.R. 475, 479 (D. Del. 1993).  In this case, there is no identity of interests between the Debtor and the Guarantors such that the Debtor is the real party defendant in the State Court Action.  Nor does the State Court Action affect the Debtor, because the Debtor does not have any indemnification or contribution obligation to the Guarantors.  Accordingly, there are no unusual circumstances present in this case to warrant the extension of the automatic stay to the Guarantors.

47.     Lastly, contrary to the Debtor's assertions, WFF is not attempting to circumvent the automatic stay provisions or deny the Debtor a breathing spell by pursuing the Guarantors in the State Court Action.  The State Court Action is against non-debtors and seeks payment from assets that are not property of the Debtor's estate.  The Debtor has no obligation to indemnify the Guarantors on account of WFF's claims under the Guaranty.  Moreover, none of the Guarantors have any day to day involvement in the Debtor's operations or its restructuring. The Debtor has a chief restructuring officer (who is not a Guarantor), and employs a property management company to manage the premises.

For all the foregoing reasons, WFF respectfully requests that the Court deny the Motion and grant WFF such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 9, 2010

HERRICK, FEINSTEIN LLP
*Attorneys for W Financial Fund, LP*

By:   */s/ Andrew C. Gold*
    Andrew C. Gold
    Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com
hhuynh@herrick.com